UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | |
|---|---|
| UNITED STATES OF AMERICA : | |
| : | CRIMINAL ACTION NO. |
| v. : | 09-cr-120 (JCH) |
| : | |
| JASON BAYER, : | FEBRUARY 18, 2010 |
| Defendant. : | |

**RULING RE: MOTION FOR SAFETY VALVE RELIEF (Doc. No. 49);
MOTION TO STRIKE (Doc. No. 55)**

I.  INTRODUCTION

On May 26, 2009, Jason Bayer ("Bayer"), the defendant in this case, pleaded guilty to a one-count information charging him with possession with the intent to distribute five grams or more of crack cocaine, in violation of 21 U.S.C. §§ 841(a)(1) and 841(b)(1)(B)(iii).  Under those statutes, Bayer faces a mandatory minimum sentence of five years imprisonment.  However, Bayer contends that he is eligible for a departure below the statutory minimum, in light of the "safety valve" provision of the United States Sentencing Guidelines.  See U.S.S.G. § 5C1.2.   While Bayer indisputably satisfies most of the prerequisites for safety valve eligibility, the parties dispute whether Bayer possessed a firearm "in connection with" his drug offense.  U.S.S.G. § 5C1.2(a)(2).  Bayer's Motion for Safety Valve Relief (Doc. No. 49) was filed on January 8, 2010.  For the following reasons, the court grants the Motion for Safety Valve Relief.

1

**II.   DISCUSSION**[1]

    A.    <u>Legal Standard</u>

The Second Circuit has held that the " 'in connection with the offense' language of § 5C1.2(2) is equivalent to the 'in relation to' language of 18 U.S.C. § 924(c)(1)." <u>DeJesus</u>, 219 F.3d at 122.  This means that "[t]he weapon 'at least must facilitate, or have the potential of facilitating, the drug trafficking offense.' " <u>Id</u>. (quoting <u>Smith v. United States</u>, 508 U.S. 223, 238 (1993)).  The Second Circuit has approvingly cited <u>United States v. Hallum</u>, 103 F.3d 87, 89 (10th Cir. 1996), for the proposition that "a firearm's proximity and potential to facilitate the offense is enough to prevent application of U.S.S.G. § 5C1.2(2)."  <u>See</u> <u>DeJesus</u>, 219 F.3d at 122.  At the same time, the government cannot prevent application of the safety valve by relying on the generalization that "any time a drug dealer possesses a gun, that possession is in furtherance, because drug dealers generally use guns to protect themselves and their drugs."  <u>United States v. Snow</u>, 462 F.3d 55, 62 (2d Cir. 2006) (quotation marks and citation omitted).  Indeed, "[t]he mere presence of a weapon at the scene of a drug crime, without more, is insufficient to prove that the gun was possessed 'in furtherance of' the drug crime."  <u>Id</u>. (quotation marks and citation omitted).  Instead, the government must establish the existence of a specific "nexus" between the charged firearm and the charged drug selling operation.  <u>Id</u>.  That is, "the ultimate question is whether the firearm 'afforded some advantage (actual or potential, real or contingent) relevant to the vicissitudes of drug trafficking.' " <u>Id</u>. (citing <u>United States v. Lewter</u>, 402 F.3d 319, 322

---

[1] The court assumes familiarity with the facts of this case, which were discussed in the January 4, 2010 Ruling on Bayer's Motion to Disclose the Identity of the Confidential Informant (Doc. No. 46).

(2d Cir. 2005)).

Courts look to various factors in determining whether there exists a "nexus" between the charged firearm and the charged drug selling operation:

> the type of drug activity that is being conducted, accessibility of the firearm, the type of the weapon, whether the weapon is stolen, the status of the possession (legitimate or illegal), whether the gun is loaded, proximity to drugs or drug profits, and the time and circumstances under which the gun is found.

Snow at 62 n.6 (citations omitted). The court herein considers these factors.[2]

    B.    Factual Findings

        1.    Type of Drug Activity Being Conducted

At the time he was apprehended on December 11, 2008, Bayer was planning on selling 26 grams of crack cocaine to a confidential informant ("CI"). That amount of crack cocaine was worth approximately one thousand dollars.

        2.    Accessibility of the Firearm

When Bayer consented to the search of his car, his handgun was located beneath the front passenger seat, towards the rear of the seat. See Government's Exh. 3, 4 (photographic evidence). The front passenger seat had been moved back in a position that was most (if not all) of the way towards the rear of the car. Government's Exh. 3. That seat was also reclined to a greater degree than the driver's seat. Id. With the right rear door of the car open, part of the handle of the gun was visibly protruding from under the rear of the front passenger seat. Id. The remainder of the gun was obstructed from view. Id. Because the front passenger seat had been moved back and

---

[2] At the Fatico hearing held on December 17, 2009, the government assumed the burden of proving that the gun found in Bayer's car was being held "in connection with" his drug offense.

reclined, the amount of space between the back of the front passenger seat and the front of the right rear seat was very small (approximately 4 to 6 inches).  Id.

Bayer is a very big man.  Memorandum in Support of Motion for Disclosure of Confidential Informant at 9 (Doc. No. 39) (stating that Bayer is six foot three inches tall and weighs 330 pounds).  The car he was driving, a four-door, 3-series BMW sedan, has a relatively small interior.  Due to the difficult-to-reach position of the handgun, Bayer's height and weight, and the size of Bayer's car, the court finds that Bayer could not have readily accessed the gun during the drug transaction, either for purposes of self defense or to otherwise "facilitate" the deal.  Indeed, the court finds that the gun was extremely unlikely to afford any advantage to Bayer during the transaction with the CI, even in the event that Bayer had decided to reach for the gun from either the driver's seat, the front passenger seat, or the rear door.

       3.      Whether the Weapon is Stolen

Bayer's weapon is not stolen.

       4.      The Status of Possession

Bayer's possession of the handgun was legal.  He is the licensed owner of the handgun at issue in this case.

       5.      Whether the Gun was Loaded

Bayer's gun was loaded at the time it was seized during the consent search.  The gun was loaded with hollow point bullets, which, as the Second Circuit has stated, "provide greater protection than normal bullets."  United States v. McCoy, 303 Fed. Appx. 45, 47 (2d Cir. 2008).

      6.      Proximity to Drugs or Drug Profits

As noted, supra, Bayer's gun was located in the same car as 26 grams of crack cocaine. The gun was located under the front passenger seat, towards the rear of the seat. The crack cocaine was located in the glove compartment and contained within a Starbucks coffee bag.

      7.      The Time and Circumstances Under Which the Gun was Found

Bayer was enrolled in a bail enforcement agent class at the time of the planned crack sale on December 11, 2008. The court credits Bayer's testimony that, as part of his training to be a bail enforcement agent, he had routinely carried with him a loaded firearm for months prior to that date. Given Bayer's habit of carrying the firearm, which was legally owned and registered to him, its presence in Bayer's car on December 11, 2008, was coincidental, and unconnected, to the drug offense.

The court also credits Bayer's testimony that he did not feel threatened in the environment in which the drug deal with the CI was to take place. The drug transaction was set up to occur in daytime at a Subway store. The Kimberly Avenue Subway is located in a shopping center that also houses other business, and the parking lot in which the transaction was to take place appears to have been shared by other establishments. See Defendant's Exh. A (Doc. No. 50). The parking lot was crowded with cars and people when Bayer arrived. Id. While the government has suggested that the CI's newfound ownership of a shotgun made Bayer more apprehensive about the impending drug deal, see Government's Memorandum in Opposition (Doc. No. 51) at 2, it is simply implausible that Bayer would have feared the remote possibility of the CI wielding a large and conspicuous firearm and attempting to rob Bayer in broad

daylight in a crowded commercial area.  Moreover, Bayer and the CI were on friendly terms at the time of the planned crack sale on December 11, 2008.  Earlier that day, Bayer had invited the CI to come to Bayer's home, in order to purchase that shotgun.  The court credits Bayer's testimony that he would not have allowed the CI to enter his house had Bayer feared the CI.

Special Agents Wheeler and Riordan testified that, at the time of the consent search, Bayer stated that he was carrying the firearm because he did not know whether the CI was "on the up and up."  Bayer testified that he never made such a statement.  The government argues that this statement to the Special Agents indicated that Bayer did not trust the CI, thus supporting the conclusion that Bayer had the firearm in the car to protect himself during the drug transaction.  However, neither Special Agent made notes of the "up and up" statement at the time it was allegedly made.  Moreover, the "up and up" statement did not appear in a written report until January 8, 2009, almost a month after Bayer was arrested.  Based on the lack of any contemporaneous documentation of the "up and up" statement, as well as the court's observations of the witnesses during their testimony at the Fatico hearing, the court does not find that Bayer made the "up and up" statement.

The government further argues that Bayer's assertion, that he was planning to go to the shooting range following the transaction with the CI, is doubtful because (1) Bayer did not have class on December 11, 2008, and he admits that he had never before gone shooting on a day when he did not have class, and (2) he claims that he was in dire financial straits at the time of his dealings with the CI.  However, Bayer's testimony that he had planned to go to the shooting range following the drug deal is

credible. No reservation was required for a shooting lane, and the total amount of money needed to rent a lane was less than $30 per hour. Further, the principal reason for his trip to the shooting range was his intention to use some of the drug proceeds to pay the balance of his class fee. He could not graduate if he had an unpaid balance, and the final class was scheduled for December 17, 2008. See Letter of Paul E. Smith (Doc. No. 39, Exh. A). He had been short of cash, and he wanted to pay when he got the drug proceeds, avoiding the risk he would spend it before December 17, 2008.

It is also worth noting that, when Bayer left his car after arriving to the Subway parking lot, he left his gun under the front passenger seat, in the position described supra. Thus, when Bayer was apprehended by Special Agents Wheeler and Riordan, he was unarmed. The fact that Bayer was unarmed when he left his car bears on the court's finding that Bayer did not anticipate the possibility that he might have to use the gun in self defense during the impending crack sale. Moreover, in light of Bayer's testimony that he regularly carried a gun as part of his bail enforcement training, the fact that Bayer did not reach to pick up the gun before he exited the car supports the court's conclusion that the gun was not easily reachable from the driver's seat.

C.   Summary

When Bayer entered the Subway parking lot on December 11, 2008, he expected to sell 26 grams of crack to the CI. It was daylight, and the parking lot, which served multiple businesses, was full. Bayer had no reason to expect that the gun he happened to be carrying when he entered his car, for bail enforcement training purposes, might be employed during the impending drug sale. Bayer simply did not fear the CI, whom Bayer had invited to his home that same day.

Had the agents not intercepted Bayer on December 11, 2008, it would have been difficult for him--during, or in connection with, the planned drug sale--to access his gun quickly enough to "afford[ him] some advantage (actual or potential, real or contingent) relevant to the vicissitudes of" the transaction. Lewter, 402 F.3d at 322. The car Bayer was driving was small, and the gun had been placed underneath and towards the rear of the front passenger seat, which had been moved back and slightly reclined. Bayer would have been unable to grab the gun easily or quickly. When Bayer left the car, he did not bother retrieving the gun from its position under the front passenger seat. As he walked towards the restaurant to meet with the CI, he was apprehended, and then questioned, by Special Agents Wheeler and Riordan. While the government claims that Bayer told the Special Agents that he was carrying the gun because the CI was not "on the up and up," the court finds that Bayer did not make such a statement.

The government has not carried the burden that it assumed at the December 17, 2009 Fatico hearing. The government has not established a nexus between Bayer's gun and his planned drug transaction with the CI. To the contrary, the court finds that it is more likely than not that the gun's presence in Bayer's car on December 11, 2008, was coincidental and served no purpose, actual or potential, with respect to the impending drug transaction.

## IV. CONCLUSION

For the foregoing reasons, Bayer's Motion for Safety Valve Relief (Doc. No. 49) is **GRANTED**.  In addition, the court will **GRANT** the government's Motion to Strike (Doc. No. 55), because the court has not relied on the Affidavit submitted as an attachment to Bayer's Sur-Reply brief.

**SO ORDERED.**

Dated at Bridgeport, Connecticut this 18th day of February, 2010.

/s/ Janet C. Hall
Janet C. Hall
United States District Judge